**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 19-cr-80030-WPD**

**UNITED STATES OF AMERICA**

**vs.**

**AARON SINGERMAN,**

**Defendant.**
_______________________________________/

**FACTUAL PROFFER IN SUPPORT OF GUILTY PLEA**

The United States of America and **AARON SINGERMAN** (the "Defendant"), agree that were this case to proceed to trial, the United States would prove the following facts beyond a reasonable doubt. They further agree that these are not all of the facts that the United States would prove if the case proceeded to trial, but are sufficient to prove the charges of: introduction of unapproved new drugs into interstate commerce (Count 3) and conspiracy to manufacture and distribute a controlled substance (Count 4).

Summary

The Defendant co-owned and controlled Blackstone Labs, LLC ("Blackstone"), a Florida corporation that distributed products labeled as dietary supplements, many of which were illegal under federal law. The Defendant, Phillip Braun ("Braun"), and a co-conspirator incorporated Blackstone for the specific purpose of obscuring the sale of products marketed as dietary supplements that were tainted with anabolic steroids and therefore could not lawfully be sold. As a co-owner and CEO of Blackstone, the Defendant directed Blackstone and agents of Blackstone. In May 2016, the Defendant ceased to be CEO of Blackstone, but continued to earn monthly income from Blackstone as a co-owner. In 2018, the Defendant sold his 35% share of the company to another individual to satisfy a debt.



While running Blackstone and enriching himself, the Defendant knowingly sold and directed others to sell unapproved new drugs, with the intent to defraud or mislead, in violation of the Food, Drug, and Cosmetic Act ("FDCA"), Title 21, United States Code, Sections 331(d), 355(a), 333(a)(2), and Title 18, United States Code, Section 2. From in or around December 2014, through in or around September 2016, in the Southern District of Florida, and elsewhere, Defendant knowingly conspired and agreed with others to manufacture and distribute controlled substances, namely, multiple anabolic steroids, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(E), and 846.

<u>Defendant and His Co-Conspirators Founded Blackstone Labs to Sell Supplements Tainted with Steroids</u>

In August 2012, the Defendant worked as director of marketing for a company owned by Robert DiMaggio ("DiMaggio"), selling products labeled as dietary supplements. Defendant Phillip Braun worked with Defendant at that company. The company had been selling a product to consumers, Super DMZ RX 2.0, which contained 17b-hydroxy 2a, 17b-~~demthyl~~ dimethyl 5a-androstan 3-one azine, also known as dimethazine or dymethazine and 2, 17a-dimethyl-17b-hydroxy-5a-androst-1-en-3-one, also known as methylstenbolone, each of which was a synthetic steroid. The Defendant and his co-conspirators frequently referred to these chemicals and other similar chemicals as "designer steroids" or "prohormones." The Defendant and Braun knew dimethazine and methylstenbolone were the two key ingredients in the product and that Super DMZ RX 2.0 was marketed as promoting muscle growth. For a product like Super DMZ RX 2.0 to be a legally labeled a "dietary supplement" under the FDCA, it had to contain legal "dietary ingredients." Defendant knew that dimethazine and methylstenbolone were synthetic substances designed to build muscle and were not dietary ingredients as defined in the FDCA. Defendant further knew that Super DMZ RX 2.0 was being illegally marketed as a dietary supplement.

To reduce the likelihood of the FDA investigating or negatively affecting Robert DiMaggio's existing business, Defendant incorporated Blackstone with Phillip Braun and Robert DiMaggio to continue the illegal sale of Super DMZ RX 2.0. While the Defendant, Braun, and DiMaggio were co-owners of Blackstone, they agreed that the Defendant and Braun would run day-to-day operations. This allowed the Defendant, Braun, and DiMaggio to earn a share of profits from the sales of the Super DMZ RX 2.0 product, while reducing Robert DiMaggio's exposure to law enforcement scrutiny and risk. The Defendant and Braun lived in South Florida and worked first out of a garage and then at Blackstone's office, which was located in Boca Raton. After receiving initial input from the DiMaggio, the Defendant and Braun ran Blackstone's day-to-day operations. DiMaggio remained an owner of the company until in or around May 2014, when he sold his ownership interest to the Defendant and Braun, which was later re-sold to a silent partner.

The Defendant, Braun, and DiMaggio discussed the legal risks of starting this new company to sell illegal products. In an email dated January 16, 2013, DiMaggio advised the Defendant and Braun to move their computer server offshore to avoid US law enforcement accessing their information. To conceal the illegal nature of Super DMZ RX 2.0 from consumers and the FDA, the Defendant, Braun, and DiMaggio used a website, www.superdmz.com, that falsely described the product as "100% legal," when the conspirators knew it was not legal because they were unapproved new drugs.

In early 2013, Defendant, Braun, and DiMaggio found out that the FDA had discovered that certain products, including Super DMZ RX 2.0, were tainted with anabolic steroid methasterone, aka SuperDrol.

In March 2014, the Defendant received and read FDA enforcement reports stating that a manufacturer of Blackstone's products had conducted a recall of Blackstone's steroid products,

Methadrol and Super DMZ RX 2.0. In emails dated March 13, 2014, the Defendant emailed DiMaggio and Braun seeking advice about how to respond after reviewing the FDA enforcement reports. The Defendant and Braun knew, as stated in the FDA enforcement reports, that the manufacturer recalled the products because they were unapproved new drugs, but the Defendant, Braun, and Blackstone continued selling the products.

On or about September 26, 2014, with intent to defraud or mislead, the Defendant caused to be introduced into interstate commerce 400 bottles of Super DMZ RX 2.0, an unapproved new drug. That shipment was sent from the Southern District of Florida to Arkansas. In an email dated September 26, 2014, in which the Defendant was cc'ed, Braun instructed that the shipment "must go out today!"

The Defendant and Braun also introduced, marketed, and distributed additional new steroid products for Blackstone, including Alpha-1 Max, which contained another designer steroid, methyl-1-etiocholenolol. In an email on April 17, 2013, the Defendant discussed with DiMaggio the steroid they included in Alpha-1 Max, stating, "PJ [Braun] and I are thinking about putting up the money to run a thousand of these" and describing the ingredient as "big gains… harsh as hell." As Blackstone grew, the Defendant and Braun hired dozens of additional employees, including James Boccuzzi ("Boccuzzi"). Boccuzzi was experienced in selling products marketed as dietary supplements and worked as a manager of wholesale sales, ultimately becoming the director of sales at Blackstone. Boccuzzi's job was to sell Blackstone's products to retail stores or distributors, including anabolic steroids and unapproved new drugs.

The Defendant and Braun used Blackstone to advertise illegal products on the internet and through email and social media, falsely telling customers that the company's products were legal and were dietary supplements. Email advertising was a major component of Blackstone sales, and





the marketing emails repeatedly falsely claimed that "All our products are manufactured in FDA approved, registered, and inspected facility that maintains GMP [Good Manufacturing Practices] certification and follows all FDA guidelines." The Defendant, Braun, Boccuzzi and others knew that these statements to consumers were false, and were intended to convince consumers to buy Blackstone products. Blackstone advertisements also falsely stated that "Our pro-anabolic compounds are all third party independently lab tested before encapsulation" when the Defendant and Braun knew that their manufacturers, including Anthony Ventrella, were not testing the raw ingredients before encapsulation.

The Defendant Conspired to Manufacture Illegal Products for Blackstone Labs, LLC and Other Corporate Entities

In or around 2014, the Defendant, Braun, and other co-conspirators began manufacturing their own products through multiple corporate entities operating out of a warehouse close to Blackstone's offices in Boca Raton. In early 2014, the Defendant contacted a friend, Anthony Ventrella ("Ventrella"), about working for a new business to manufacture products for Blackstone and other companies. The Defendant informed Ventrella that the money to begin the company would come from the Defendant, Braun, and a third individual owner.

The Defendant, Braun, and a third individual incorporated the company, Fight Pharm LLC, as a Florida limited liability corporation on or about April 16, 2014. Although the Defendant, Braun, and the third individual owner were the true owners of the company, Anthony Ventrella agreed to function as the nominal owner. Ventrella's name appeared on publicly available records, even though Ventrella did not truly own or control the company. In annual corporate reports filed with the State of Florida, Ventrella was listed as the chief executive officer of Fight Pharm. Concerning Fight Pharm's important business activities, Ventrella communicated regularly with and received direction from Defendant and Braun and, to a lesser extent, the third individual owner.





Fight Pharm manufactured and distributed products labeled as dietary supplements for Blackstone and also under Fight Pharm's own brand names. These included products that were illegal to distribute under federal law because they were unapproved new drugs and/or controlled substances.

In or around November 2015, the Defendant, Braun, and Ventrella established another Florida limited liability corporation to manufacture dietary supplement products. VBS Laboratories, LLC ("VBS"), which stood for the initials of the three owners, Ventrella, Braun, and the Defendant (Singerman), also manufactured products labeled as dietary supplements for Blackstone and other companies. These also included products that were illegal to distribute under federal law because they were unapproved new drugs and/or controlled substances. Fight Pharm and VBS were established, at least in part, to conceal Blackstone, the Defendant, and Braun's involvement in the illegal manufacturing and sales of unapproved new drugs and/or controlled substances.

<u>The Designer Anabolic Steroid Control Act</u>

On December 18, 2014, the Designer Anabolic Steroid Control Act of 2014 ("DASCA") was signed into law and took effect. Among other things, DASCA significantly expanded the definition of "anabolic steroid" in the Controlled Substances Act ("CSA"), of Title 21 of the United States Code. After the passage of DASCA, a "controlled" anabolic steroid included substances listed in the CSA, and also included any drug or substance derived from, or with a chemical structure substantially similar to, one or more listed anabolic steroids so long as such drug or substance: (a) was created or manufactured with the intent of producing a drug or substance that promotes muscle growth or causes a pharmacological effect similar to that of testosterone; or (b) has been, or is intended to be, marketed or promoted in any way that suggests that consuming the





drug or substance will promote muscle growth or any other pharmacological effect similar to that of testosterone.

The Defendant and his co-conspirators were aware of DASCA even before it became law, and knew that DASCA would negatively impact their business and their industry. Prior to the law's enactment in December 2014, the Defendant and Braun received a proposal from a lobbying firm, which included a proposed plan to stop or delay the enactment of DASCA. The lobbying proposal described the bill's effect as "expand[ing] the definition of anabolic steroids in the Controlled Substances Act (CSA) to include 25 specific substances and any drug or hormonal substance that is derived from or has a chemical structure substantially similar to, one or more of the listed anabolic steroids." Supplement retailer Leonard Shemtob ("Shemtob") emailed the Defendant a copy of the lobbying proposal, and the Defendant, Braun, Shemtob and the lobbying firm joined at least one telephone call during which they discussed the substance of DASCA. The Defendant and Braun also discussed DASCA with a silent owner of Blackstone, who emailed the Defendant and Braun information on or about December 22, 2014, explaining how DASCA applied to their designer steroid products, and stating that Blackstone must stop selling those products and destroy remaining products in their inventory by sending them to a medical disposal company.

After DASCA took effect on December 18, 2014, the Defendant, Braun, Boccuzzi, and Blackstone continued to sell their designer steroid products, Super DMZ and Alpha-1 Max, but increasingly did so by selling the products through Ventrella's companies, which manufactured and distributed the product on Blackstone's behalf as a Fight Pharm product, using a similar product name.





After DASCA went into effect as law, the Defendant, Braun, Blackstone, and Boccuzzi sold off the remaining stock of products understanding that the steroids in products such as EpiSmash, Halo Extreme, and Super Trenabol, were now listed as controlled substances under the CSA. These products were labeled and intended to include the anabolic steroids epistane, halodrol, and trendione, respectively, which were listed as controlled substances after DASCA became law. Sales of these products by the Defendant, Braun, Blackstone, and Boccuzzi continued into 2015 even after Blackstone required employees to sign a document acknowledging that such listed products were "Banned Prohormones."

The Defendant and his co-conspirators knew that, even after December 18, 2014, Super DMZ contained the same ingredients, methylstenbolone and dimethazine, and continued to be marketed as a muscle growth product. They also knew that Alpha-1 Max contained methyl-1-etiocholenolol, and continued to be marketed as a muscle growth product. They knew that methylstenbolone and dimethazine and methyl-1-etiocholenolol were derived from or substantially similar to other listed anabolic steroids, and therefore, were anabolic steroids and illegal under federal law. In fact, the superdmz.com website, and later Blackstone's website, included structural diagrams of these chemicals and marketing materials explaining how the chemicals were extremely similar to well-known anabolic steroids. Blackstone employees, including Boccuzzi, were expected to be familiar with the Blackstone website.

The Defendant and his co-conspirators openly sold Super DMZ and Alpha-1 Max until at least March 2015. They then removed the products from Blackstone's website and instructed salespersons to tell consumers that the products were discontinued. However, the Defendant, Braun, Boccuzzi, and other co-conspirators continued to sell the steroid products to wholesale customers directly and through Fight Pharm and VBS. For example, on August 22, 2015, Braun

asked the Defendant in an email, "I guess tell the people who want [prohormones] about Fight pharm [sic] right Aaron?" The Defendant responded, "Exactly!" Shortly thereafter, a sales employee informed the Defendant, Braun, Boccuzzi, and others that he had recently sold 30 units of Methyl DMZ, a Fight Pharm product similar to Super DMZ RX 2.0 that contained anabolic steroids. In an email on October 27, 2015, the Defendant told a Blackstone employee asking about Fight Pharm, "You can sell them. Just make SURE to explain that is NOT our company." Braun responded to the email chain, "Its [sic] very important people do not think we have anything to do with this!"

Between December 18, 2014, and February 2017, the Defendant, Braun, Boccuzzi, Blackstone and other members of the conspiracy caused to be manufactured and distributed into commerce thousands of 60-capsule bottles that they knew contained methylstenbolone, dimethazine, and/or methyl-1-etiocholenolol in violation of the Controlled Substances Act. These products included Super DMZ RX 2.0, Alpha-1 Max, Fight Pharm versions of these products, and other product names.

The Defendant Impeded FDA Efforts to Protect Consumers from Unsafe Products

From in or around August 2012 through in or around February 2017, the Defendant, Braun, Boccuzzi, Blackstone, and others knowingly agreed to engage in conduct that interfered with or obstructed the FDA's lawful authority to protect consumers in overseeing and regulating food, drugs, and dietary supplements, using deceit, dishonesty, and other dishonest means.

Among other things, the Defendant helped conceal his and Braun's role in Fight Pharm and VBS so that Ventrella could manufacture products labeled as dietary supplements that were unlawful under the FDCA and the CSA. Moreover, the Defendant knew that Fight Pharm, and its successor companies, fraudulently imported raw ingredients for their products from China because





they could not lawfully purchase the same ingredients from within the United States without attracting the scrutiny of the FDA.

When Blackstone could no longer publicly sell its steroid products, the Defendant, Braun, and Blackstone introduced a new category of products containing selective androgen receptor modulators, or SARMs, which also were sold in violation of the FDCA. The active ingredients in these products were not dietary ingredients, but were research chemicals under clinical investigation to build muscle. In 2015, Blackstone received a Warning Letter from the FDA warning that Blackstone product Angel Dust, which contained the stimulant Amp Citrate, aka DMBA, was being unlawfully marketed as a dietary supplement and that Blackstone should immediately cease distribution or risk enforcement. The Defendant, Braun, and Blackstone sold all of their remaining product, rather than immediately stopping the distribution.

In another example of the Defendant's efforts to impede FDA regulation, the Defendant sent an email on or about June 24, 2015 to Braun and Blackstone employee David Winsauer, stating, "We didn't want any SARMS advertised in Mags . . . Our OSTAPURE ad in MD [Muscular Development magazine] may cause some problems now. Please never do that again. You had 1/3 page for OSTAPURE in the most recent one and now someone who saw it might report us to FDA." In addition, when a dietary supplement competitor sued Blackstone for making products that were unlawful, Blackstone filed a sworn declaration from Aaron Singerman under penalty of perjury in that litigation, falsely stating that Blackstone had stopped selling the products Angel Dust and Super DMZ after April 7, 2015, when in fact, as the Defendant well knew, they continued to sell the products.

The Defendant knew that many of Blackstone's other products, including products containing synthetic stimulants DMAA and DMBA, and products containing the nootropic

chemical picamilon, were also sold in violation of the FDCA. The Defendant and Braun also knew that Blackstone disregarded complaints from consumers who reported getting ill or injured from Blackstone's products. Blackstone did not notify the FDA of such complaints, even when required by law.

Proceeds of the Drug Conspiracy

The Defendant, Braun, Boccuzzi, and Blackstone earned significant proceeds from the sale of anabolic steroids during the conspiracy. The Defendant's direct and indirect proceeds included money he withdrew each month from Blackstone's bank account, money he withdrew from Fight Pharm and VBS bank accounts, a $218,117 payment for a Rolls Royce Ghost automobile for the Defendant's personal use, the value of his ownership of Blackstone shares, and other benefits that totaled at least $2,900,000.

JUAN ANTONIO GONZALEZ
UNITED STATES ATTORNEY

GUSTAV W. EYLER
DIRECTOR
U.S. DEPARTMENT OF JUSTICE
CONSUMER PROTECTION BRANCH

Date: 11/17/2021

By: ______________________
ALISTAIR F.A. READER
Trial Attorney
JOHN W. BURKE
Assistant Director
STEPHEN J. GRIPKEY
Trial Attorney
DAVID A. FRANK
Senior Litigation Counsel





Date: 11/11/21 By: ______________________
Jim Durham, Esq.
Attorney for Defendant

Date: 11/11/21 By: ______________________
Aaron Singerman
Defendant