UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-80030-CR-DIMITROULEAS/MATTHEWMAN

UNITED STATES OF AMERICA,

        Plaintiff,

v.

AARON SINGERMAN,

        Defendant.

_____/

<u>DEFENDANT AARON SINGERMAN'S SENTENCING MEMORANDUM</u>

    Defendant Aaron Singerman respectfully submits this memorandum to provide information to assist the Court with fashioning its sentence in this case. Given all the relevant circumstances here, a sentence of no more than 20 months' imprisonment would be "sufficient but not greater than necessary" to comply with the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2).

Relevant Sentencing Factors

    In such cases as *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court restored the district court's power to fashion a sentence tailored to the individual circumstances of the case and the individual defendant. The guideline range determined under the United States Sentencing Guidelines no longer binds this Court, but instead is only one factor among many to be considered in fashioning a sentence. *See Booker,* 543 U.S. at 258-260; 18 U.S.C. § 3553(a). Other relevant factors include "the nature and circumstances of the offense" and the "history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), the need to advance sentencing purposes of punishment and deterrence, *id.* § 3553(a)(2), "the kinds of sentences available," *id.* § 3553(a)(3), "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," *id.* § 3553(a)(6), and "the need to provide restitution to any victims

of the offense, *id.* § 3553(a)(7). The directive for this Court is to "impose a sentence sufficient, but not greater than necessary" to accomplish the purposes of sentencing. 18 U.S.C. § 3553(a).

## Discussion

### A. Nature and Circumstances of the Offense.

Mr. Singerman does not and cannot contest the seriousness of the charges to which he has now pleaded guilty. He was involved in a conspiracy to distribute anabolic steroids through Blackstone Labs and other related companies (Count Four, PSI ¶¶ 68-74), and he participated in mislabeling, marketing, and distributing certain compounds as "dietary supplements" when actually those compounds were unapproved new drugs (Count Three, PSI ¶¶ 15, 23-64.)

However, Mr. Singerman's active role in any of the conduct underlying those charges ended in April 2016. As the presentence report notes, Mr. Singerman left Blackstone Labs in that month, following a disagreement with co-owner P.J. Braun; after April 2016, Mr. Singerman could not and did not exercise any day-to-day control over that business. (PSI ¶¶ 116, 193.) Mr. Braun expressly prohibited Blackstone's vendors – including Anthony Ventrella and VenTech Labs (*see* PSI ¶¶ 58, 118) – from doing any business with Mr. Singerman thereafter. Blackstone persisted in criminal conduct after Mr. Singerman lost active control of it, including through the creation of false "certificates of free sale" (PSI ¶¶ 59-60), continued distributions of controlled substances (PSI ¶¶ 80-81), and attempts to thwart the federal investigation (PSI ¶¶ 62-64). Both the federal search warrant executed at Blackstone and other locations during that investigation (in February 2017, *see* PSI ¶ 62) and the indictment in this case (in March 2019, Doc. 1) significantly post-dated Mr. Singerman's departure.

Mr. Singerman's departure from Blackstone Labs was an inflection point for him, bending the arc of his life away from the crimes at issue in this case. His actions during the nearly six subsequent years provide context and guidance for this Court with respect to the person that Mr. Singerman is and has grown to be. After departing Blackstone Labs in April 2016, Mr. Singerman founded his own company, RedCon1. RedCon1 quickly became the fastest growing sport supplement company

in history, and it currently employs over 100 people in south Florida and nearly 200 people nationwide. The entire staff of RedCon1 was continuously employed throughout the COVID-19 pandemic, due in no small part to Mr. Singerman refusing a personal salary from the business and redirecting those funds to RedCon1's employees.

From the outset, Mr. Singerman's goal at RedCon1 was to create safe, legal products appealing to a broad range of consumers. His business partner describes the decision to form RedCon1 as follows:

> The first thing we decided when the company was formed is we wanted to do the things that worked in our previous companies and throw out the things that didn't. We wanted to form a brand that stood for something and brand that would be long lasting, not just a business to make money. . . . ***[O]ne of the things that was non-negotiable for us was setting the standard for quality and safety in the industry.*** If people were going to vote on us with their dollars, we were going to ensure that they were getting what they paid for and were getting the best quality and formulated products on the market.

(Letter of E. Hart.)[1] Another early employee of RedCon1, who left Blackstone with Mr. Singerman to start that company, confirms that:

> [t]he main focus of building the company was to be as by the book as possible. We accomplished that by hiring in house counsel to deal with compliance, testing every product and staying ahead of the curve of what ingredients are or are not compliant. . . . ***It has been our mission from day one to be a purpose driven company that sets the example for the whole industry.***

(Letter of E. Silva.) The leader of the advertising agency asked to help Mr. Singerman develop the RedCon1 brand recalls:

> [Mr. Singerman] wanted to change how he did things and make things right going forward. He had a good idea and wanted to do it the right way. . . [H]e was regretful . . . for the role he played. He wanted me to know that he had a vision to build a company that had the highest moral

---

[1] Each of the letters cited within this Memorandum is within the collection of letters attached as Exhibit A, organized alphabetically by last name of the author.

>fibers. A company that would not only sell products but have a business model that was purpose based.

(Letter of J. Zimmerman.)

In stark contrast to Blackstone Labs, RedCon1 has never received any FDA warning letters, has never been cited or sued for marketing unapproved dietary supplements, and has never to its knowledge been the target or subject of any government investigation. Within a year of RedCon1's founding, Mr. Singerman obtained a personal certification in current good manufacturing practices and later encouraged RedCon1's president, most of its executive team, and numerous employees to do the same. Mr. Singerman hired professionals in the fields of regulatory law and compliance at RedCon1, and those individuals – still with the company – confirm that their marching orders from Mr. Singerman were to make sure that RedCon1's products and processes fell well within all of the law's requirements.

As RedCon1's Chief Legal Officer puts it, "there is zero chance that what occurred at Blackstone Labs will occur at Redcon1" because of Mr. Singerman's focus and attention to regulatory compliance. (Letter of J. Manfre.) Before Mr. Manfre ever agreed to work for Mr. Singerman and RedCon1 as their Chief Legal Officer, he demanded "assurance that no products would be sold . . . without being reviewed and approved by [him] beforehand," that "[he] would be provided with the resources necessary to ensure that Redcon1 was not only meeting, but exceeding, its regulatory requirements," and that "Redcon1 would never put profits before compliance." (*Id.*) Mr. Singerman readily agreed to those terms, and he gave free rein to Mr. Manfre and Redcon1's sophisticated regulatory team to develop, modify, and, if necessary, veto all aspects of RedCon1's manufacturing and marketing operations. (*Id.*) Mr. Singerman told Mr. Manfre, and Mr. Singerman's actions have since borne out, that "he wanted Redcon1 to be the 'gold standard in regulatory compliance.'" (*Id.*) RedCon1's Compliance Officer sees the company's standards as "uncommon in the industry" and "only possible when the starting point, the DNA of the company, [is] compliance and ethics, and that in turn is established through tone at the top,

4

starting with [Mr. Singerman]." (Letter of A. Connors.) Mr. Singerman "has built a company with compliance policies and procedures that are second to none in the industry." (*Id.*)

One significant failure at Blackstone Labs during the course of the conspiracy was the failure to treat seriously any reports by customers of potential adverse reactions to that company's products. As a result of Mr. Singerman's leadership at Redcon1, every employee there with potential customer contact is "trained (and retrained) on how to handle incoming health complaints," and every such complaint is investigated, tracked, followed up, and reported to Redcon1's Chief Legal Officer regardless of its perceived severity. (Letter of J. Manfre.) An independent third-party safety group with on-staff physicians reviews *every* complaint of this sort received by anyone at RedCon1, and that independent group determines whether and how to report that event to the FDA. This process well exceeds regulatory requirements established by the FDA and imposes significant additional costs on the RedCon1 business. But Mr. Singerman "approved these costs without hesitation," just as he has "always approved granting more resources to quality control [and] safety and compliance" at RedCon1 and "continues to reinvest into these most important areas as [RedCon1] continues to grow." (*Id.*)

Mr. Singerman's involvement in RedCon1 illustrates that he long ago turned away from the criminality at the heart of this case. He could have left Blackstone Labs after his disagreements with Defendant Braun and attempted to replicate the illegal conduct occurring there in his own business, but he followed a different path. He has demonstrated over and over again during the last six years that he is committed to participating in the supplement industry legitimately, lawfully, and with a focused eye on consumer safety. He is a demonstrably different businessman and person today than he was nearly six years ago, and his purposeful actions in creating RedCon1 show a public and intentional repudiation of the kind of criminal conduct that led to his indictment in this case.

B.     **History and Characteristics of Defendant Aaron Singerman.**

Mr. Singerman's core characteristics as a person, and his value to society, are reflected in much more than just his business activities. Mr. Singerman is a husband and father first, not an entrepreneur. He has exhibited a deep well of generosity and support to military veterans through numerous charitable initiatives over the years. He has personally impacted his employees, friends, and even complete strangers by sacrificing his time, efforts, and money to make their lives dramatically better – especially when those people struggle, as he has throughout his life, with substance abuse and addiction.

1.     **Mr. Singerman's Family.**

Mr. Singerman is 42 years old. Though he has enjoyed great success as an entrepreneur, he considers his family to be his greatest source of pride and accomplishment. He is a devoted son to his mother Lynne, husband to his wife Darielle, and a devoted father to his three young sons, ages nine, six, and four. Mr. Singerman takes his responsibilities as a father seriously. He is in charge of bedtime nightly, reading stories to each of his children and helping them all wind down to sleep. (Letter of L. Singerman.) In preparation for this Court's sentence, Mr. Singerman has been reading their favorite books and recording his voice so that his boys can listen to him in the event he is incarcerated. (PSI ¶ 155.) Most Sundays, he takes his kids for a "boys day out" where they go for donuts, play games, create challenges for one another, and watch movies. He is a regular at their baseball and soccer games, sponsoring their leagues and often swapping with his wife to cover multiple games at once.

Mr. Singerman teaches his kids to be good citizens and people, to respect those serving in the military and law enforcement, and to appreciate the benefits and responsibilities of being in this country. All of his kids know by heart the "Singerman Rules," which he has taught them by rote and example their whole lives and has posted in their home, including that Singermans "try their hardest," and "tell the truth, no matter what," and "treat others with respect." (Letter of D. Singerman.) His boys are regulars at the RedCon1 offices and join their father for business trips;

they are by his side volunteering at charity events; they are at the dinner table every night with Mr. Singerman and his wife to talk through their days. Every Black Friday weekend for the last five years, Mr. Singerman has brought his kids to work with him packing products, creating labels, and assembling orders alongside the RedCon1 shipping department during one of the busiest times for that business. His oldest son says that these weekends working with his father are his favorite part of the year.

Many of those who have written letters to this Court in support of Mr. Singerman know and respect him first as a father. They have seen that Mr. Singerman's "motives and intentions" are "drastically different" now because of his family and children. (Letter of R. Monahan.) His rabbi has watched Mr. Singerman's "focus slowly . . . being almost exclusively as to how he can be a better example for his children and a pillar of support." (Letter of A. Gopin.) They know, because Mr. Singerman's daily life demonstrates it, that he "builds character in his 3 boys" by teaching them "to treat people with kindness, to give before you can receive, to work hard for things in life, and to NEVER give up." (Letter of T. Schnaars.) Mr. Singerman is "a protector and provider . . . loyal, capable, and present" who would "do anything for" his family (Letter of J. Primiano), a "fantastic father to his children" who "instills guidance and life lessons to ensure that they grow to be true gentlemen" (Letter of S. Rosario). By Mr. Singerman's example, and by freely sharing his time and advice, he makes those around him "better m[e]n, husband[s], father[s], and leader[s]." (Letter of E. Silva.)

### 2. Mr. Singerman's Charity Work.

Mr. Singerman has an abiding passion for supporting military veterans through charitable work and donations, with one source of that passion being his grandfather's military service during World War II. Under Mr. Singerman's leadership, the RedCon1 family of companies includes a 501(c)(3) nonprofit – the RedCon1 Foundation, Inc. That Foundation's mission is to "make a positive and dramatic impact on the families of our United States Military Heroes."

The Foundation has provided direct financial assistance to numerous military veterans in crisis, meals to veterans housed by the Veterans Administration, mortgage payments to struggling service members,[2] and back-to-school supplies for military families stationed in South Florida.[3]  It seeks out opportunities to provide for the immediate needs of families of active-duty service members who die in the line of duty, and for the immediate needs of veterans and their families who experience unexpected and critical financial stress.[4]  The Foundation organizes an event each year to honor the lives lost on September 11, 2001,[5] and donates funds raised at that event for the benefit of military families in need; it raises and donates money dedicated to promoting Special Olympic Games held on military installations; it gathers toys every holiday season in cooperation with local Marines' Toys for Tots campaign. (Letter of R. Wilkins.)  Even outside the auspices of the Foundation, Mr. Singerman donates his time and resources to other charities and organizations seeking to honor and help military veterans. (Letter of L. Uridel; Letter of T. Merritt.)

The impact that Mr. Singerman has had on U.S. military veterans across this country, through the work of the RedCon1 Foundation and his other selfless actions, is best described by those who have come to know him through that work:

> Nearly two years ago, I met Aaron Singerman at an event in support of a highly decorated U.S. Navy SEAL. I was surprised by the number of U.S. special warfare operators that knew him, and even more intrigued by the amount of respect and admiration they had for him. These were some of the most decorated war fighters the U.S. military

---

[2] *See* "Cpl Courtney Brown, Redcon1 Foundation Shield of Honor Recipient," https://youtu.be/w5uCcGZKqEA?list=PLz3FT4EeadlUCSa0lcqQ1TsG4CcN-nfC&t=412; *see also* "Sgt. Lauren Torres, Marine Corp Veterans, Redcon1 Foundation Shield of Honor Recipient," https://youtu.be/ey0rPbToOek?t=419.

[3] *See* "School Supply Donation," https://www.youtube.com/watch?v=Ey5Or3fx7Wk.

[4] *See* "Aaron Singerman Interviewed Live on Newsmax TV – REDCON 1 FOUNDATION," https://youtu.be/C6ycJyK7jK8?t=89.

[5] *See* "Redcon1 Remembers 9/11," https://www.youtube.com/watch?v=qBu9BnRtf60.

> has ever produced… men that killed Osama Bin Laden, or rescued Captain Phillips. These men didn't just respect and admire Mr. Singerman, they loved him, and it didn't take me long to figure out why. He spends most of his spare time devoted to supporting our veterans and first responders. His love for our country, our flag and what it represents, and those who serve, is immeasurable. If he's not working or spending time with his wife and three boys, he's actively working on improving the lives of men and women that have served our country, in ways that most people would never know. . . .
>
> Aaron Singerman, never asking nothing in return, has done so in ways that has earned the respect, love and admiration of our country's most professional and deadly war fighters, which is no easy feat. . . .

(Letter of B. Kerik, former Police Commissioner, City of New York.)

> I met Mr. Singerman 2 years ago when he found out about my family's charity supporting veterans, and ever since he has been our primary sponsor for our annual charity event in my brother's honor. . . .
>
> [Mr. Singerman's] generosity of time and energy knows no bounds. His love of country and community is apparent in all things. What he has done for the Special Operations community cannot possibly be overstated. The actions he's taken and the community leadership he provides for our veterans is critical. Aaron has been a positive impact in the lives of hundreds of veterans.
>
> I ask for leniency for Mr. Singerman. He has been punished, embarrassed, and humiliated by this process, and has learned from it. We, in the special operations community, feel his pain, as he has become one of us through his caring, compassion and work, for all of us. We not only need men like him among us, we need him.

(Letter of J. Owens, U.S. Navy SEAL and brother of U.S. Navy SEAL killed in action.)

> The love he . . . shows for our great nation and military is immeasurable. He literally dedicates his life to ensure Veterans are taken care of . . . whether its care packages . . . or donating unmeasurable amounts of money to nonprofits that support Veteran health [and] families of KIA, or Veteran outings to combat suicide. He is always there and at the forefront ready and willing.

(Letter of J. Primiano, U.S. Army Veteran, Green Beret, RedCon1 employee.)

9

> Aaron is an incredible supporter of military veteran causes. He has given hundreds of thousands of dollars to ensure that our veteran community and veteran non-profits can provide assistance in the form of healthcare and housing in this much needed time.

(Letter of S. Rosario, U.S. Navy SEAL, manager of non-profit for special operations veterans.)

Even beyond the auspices of the RedCon1 Foundation, Mr. Singerman seeks out opportunities to help those in need. He organized donations of RedCon1 products – including 20,000 protein bars – to local healthcare workers, food banks, and first responders to help support the community during the COVID-19 pandemic.[6] He sent an airplane full of donations and supplies to support his home state of Louisiana after Hurricane Ida made landfall.[7] He jumped in at the last minute to organize and host the 2020 "Murph Challenge," an annual fundraiser for a non-profit memorializing a fallen SEAL officer, at RedCon1's headquarters.[8] After the building collapse in Surfside, Florida, Mr. Singerman sought a way to help the families of victims and those displaced by that tragedy. His rabbi referred him to GoFundMe pages where he could donate money, but Mr. Singerman wanted to do more. He anonymously sponsored a housekeeper and babysitter to provide support for a young woman whose parents were missing in the collapse, wanting no personal credit but just the opportunity to alleviate the suffering of those involved. (Letter of A. Gopin.)

### 3. Mr. Singerman's Impacts on Individuals.

Mr. Singerman has transformed his own personal struggles with substance abuse and addiction into a passion for helping others overcome similar issues. During

---

[6] *See* "REDCON1 Donates Over 20,000 Protein Bars," https://www.prnewswire.com/news-releases/redcon1-donates-over-20-000-protein-bars-to-south-florida-hospitals-first-responders-and-firefighters-covid-19--301040866.html.

[7] *See* "RedCon1 Helps," https://www.instagram.com/p/CTZ9pt3AwIn/?utm_medium=copy_link.

[8] *See* "2020 Redcon1 Murph Challenge," https://youtu.be/hdM14gMPDYE?t=210.

his time at RedCon1, Mr. Singerman has made a point to hire and mentor employees with admitted substance abuse histories. When one of those employees relapsed into an addiction, his direct supervisors recommended that the employee immediately be fired. Instead, Mr. Singerman "offered countless times to help" the employee and was able to "cover[ ] all of [his] rehabilitation costs personally." One of RedCon1's executive team members credits Mr. Singerman's compassionate actions with this employee as ""literally sav[ing] a life." (Letter of R. Monahan.)

He also has used his time and experience in the supplement industry to mold military veterans into valued members of his businesses. One former Marine joined RedCon1 due to a love of bodybuilding and sports nutrition. Despite stresses and trials due to the lasting effects of PTSD, that employee has benefited from Mr. Singerman's unwavering support. Mr. Singerman has spent his time and efforts over years now to provide that employee a clear path to success and honest advice and guidance. As a member of the RedCon1 executive team puts it, it would have been "easier to just replace" that employee at times, but Mr. Singerman's actions "showed [him] that people always come before profits." (Letter of R. Monahan.)

Mr. Singerman invests his life in his employees and makes them part of his family. A current vice president at RedCon1 started with the company five years ago "packing boxes in the warehouse." He now oversees "the whole operation that I once started in," and he credits Mr. Singerman – "his mentor, role model, and . . . true father figure" – for his success. (Letter of T. Schaars.) He sees Mr. Singerman as not a "boss," but a "leader," someone who "leads, develops, trusts, and inspires their employees" and has created a place in RedCon1 where every single employee feels valued and is treated with respect. (*Id.*) Another employee – a janitor at RedCon1 – works hard to send money back to Jamaica to support his family. He kept seeking more and more work hours, and Mr. Singerman wanted to know why. When Mr. Singerman found out the details behind the janitor's work ethic, he brought the employee on full-time at RedCon1 at an increased salary, and he arranged for the employee's housing so that the employee could afford to send back to his family even more money. (Letter of A. Gopin.) Mr. Singerman's rabbi – who noticed that Mr.

11

Singerman always took time to stop and strike up a conversation with this employee around the office – says that he "rarely if ever [has] seen that level of mutual respect and genuine caring and affection between an employer and the fellow sweeping the floors." (*Id.*)

Mr. Singerman's leadership and focus on doing things the right way has made RedCon1's employees, managers, and customers his most ardent supporters. They tell this Court that he "holds everyone to a high standard but leads with empathy" and "encourages and coaches each [employee] individually to improve." (Letter of R. Monahan.) The "two traits that have been hallmarks of Aaron's character and life," especially in the last few years, are "personal responsibility and redemption." (Letter of A. Symonds.) He is hyper-focused on being "brutally honest about what he's done in the past" and "taking ownership of those mistakes, improving his shortcomings, and using lessons learned to improve himself and those around him." (*Id.*) Because of Mr. Singerman's investment in and attention to his employees, "[t]he office is literally one big family . . . the kids all come here and play together and a lot of birthday parties happen at the office; it's really an extension of himself and his home." (Letter of E. Hart.) "He's provided a lot to a lot of people, people much like myself who didn't know what was next in life for them." (*Id.*)

### 4. Mr. Singerman's Criminal History

Mr. Singerman does not come before this Court as a hardened criminal. His only criminal convictions occurred over twenty years ago, when he was a 19-year-old in the grip of an addiction to opioids and other drugs. (PSI ¶¶ 145-46.) Mr. Singerman never spent any time in prison as a result of those charges; he received a completely probated sentence after admitting his guilt. (*Id.*) The sentence he now faces before this Court will mark the first real time that any judge must decide whether Mr. Singerman needs to be removed from society as a consequence of his past actions.

### C. Need to Advance Sentencing Purposes of Punishment and Deterrence

Mr. Singerman understands that punishment for his past crimes and deterrence of any future crimes are valid considerations for this Court in setting his

sentence. However, several circumstances of Mr. Singerman's case demonstrate that those purposes may be justly served without the need for a lengthy prison term.

As discussed already *supra*, these crimes for which Mr. Singerman will be punished are well in Mr. Singerman's past. His active involvement in any of the crimes here ended in April 2016, nearly six years ago. He has worked hard to become the dedicated family man, conscientious businessman, and charitable friend and citizen that now stands before the Court. He has a wife and three young boys who rely on and need him, and a legitimate and compliant business with hundreds of employees that view him as a father figure, mentor, and friend. A community of veterans know all about Mr. Singerman's history with Blackstone and his past crimes, but they see him now as an invaluable and committed supporter of their own struggles.

Interning Mr. Singerman in a federal prison for a lengthy term does not result in any net benefit to society. No punishment of that sort is necessary to convince Mr. Singerman to avoid future crimes involving the FDA or unapproved dietary supplements or controlled substances. He already has turned away from such crimes, as decisively demonstrated by the way he built the RedCon1 business after his involvement with Blackstone, with a focus on high regulatory standards, robust compliance programs, and safety. He does not present any risk of recidivism. He is 42 years old with minimal criminal history. The Federal Sentencing Guideline Commission has acknowledged that defendants over the age of forty have a much lower rate of recidivism as compared to younger defendants. *See* Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at p. 28 (2004). Any concern at all regarding Mr. Singerman's ability to abide by the law and this Court's conditions would be driven by Mr. Singerman's admitted substance abuse history, which can be better addressed by enhanced supervision requirements and the kinds of intensive therapy and treatment available to him in the outside world, rather than housing him in a federal prison.

D.  **Kinds of Sentences Available**

This Court possesses the ability to impose a wide range of sentences that can punish and deter beyond those that contain a lengthy prison component. Mr. Singerman is eligible for a term of up to five years' probation (PSI ¶ 220) and a supervised release period of at least two years (PSI ¶ 217), and this Court can use either of those options to craft conditions that would amply serve to ensure that Mr. Singerman is punished for his conduct and stays on a law-abiding path.

Conditions of probation or supervised release could include focused community service that would permit Mr. Singerman to leverage his status and followers in the nutritional supplement industry to combat the sorts of abuses at issue in this case. He could create PSAs or otherwise partner with government regulatory agencies to raise awareness regarding the bounds of the law related to the supplement industry and the serious possible consequences of violation. His insight and experience with the industry, and the social media savvy of his businesses and himself personally, could add valuable resources to the government's efforts to deter continuing bad actors. This Court could impose a period of home confinement coupled with intensive substance abuse treatment, instead of prison, which would permit Mr. Singerman to continue to benefit society in support of his family, his company, his employees, and his charitable endeavors instead of unnecessarily locking him away.

E.  **Unwarranted Sentencing Disparities.**

Should this Court determine that a term of imprisonment is warranted for Mr. Singerman, it must consider how other comparable cases have been prosecuted and resolved around the country in order to avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(6). The advisory Sentencing Guidelines in this case call for a sentence of 63 to 78 months' imprisonment if, as Mr. Singerman requests, this Court grant him credit for his difficult decision to accept responsibility and plead guilty in this case. A sentence within that range would *far* exceed the sentences ever imposed in any comparable case anywhere in the country.

Mr. Singerman's case is not the first time that the Department of Justice has charged individuals and companies with unlawfully distributing "dietary

supplements" that contained illegal or unapproved anabolic steroids. By undersigned counsel's research, at least 17 such cases have been criminally prosecuted in the last 10 years. *See* Exhibit B (Appendix). Only two of those cases involved any term of imprisonment at all. In the rest, either the defendants all got probation or the government chose to prosecute only the company and no individuals at all. The most time in jail **anyone** served in **any** of those cases was 19 months (*U.S. v. Natalie Barton*, 2:19-CR-161 (E.D. La.)).

Little serves to distinguish those cases from this one. In the *Barton* case, government prosecutors argued for a statutory-maximum sentence based on the defendant's "vast" criminal conduct, involving warehouse and processing facilities in Louisiana that repackaged and sold powdered steroids from overseas and repackaged them for retail sale. The drug quantity involved in Ms. Barton's case was massive enough to max out her sentencing range – in the government's view, even the maximum sentence could not truly account for it. But the district court there, viewing the person involved, found that 19 months' pre-sentence custody was enough and that Ms. Barton's mental health and substance abuse issues were better served through five years of probation.

In *U.S. v. Patel, et al.*, 1:16-CR-034 (W.D. Va.), the only other case involving imprisonment, a licensed pharmacist repackaged, misbranded, and sold anabolic steroids imported from China. Mr. Patel was "very influential in the nutritional supplement industry" and "a bigger manufacturer than anyone else in terms of the . . . industry that's been involved in these cases," and he distributed "extremely harmful products" that he knew caused liver damage. He attempted to obstruct the grand jury investigation, went to trial, lied on the stand, and never indicated any intent or ability to cooperate with the government. The government wanted a substantial term of imprisonment, but the Court there found that eight months was enough: "a prison term is an important deterrence in a case such as this . . . [b]ut the length of that sentence, frankly . . . is less important than the fact that the prison sentence does exist."

15

In *U.S. v. Perkins, et al.*, 1:16-CR-120 (D. Colo), three men got probated sentences for their multi-year conspiracy to sell anabolic steroids sourced from China to U.S. consumers. In *U.S. v. Vivasis*, 5:14-CR-360 (N.D. Cal.), a U.S. Deputy Marshal got probation for operating an online dietary supplement retailer that sold steroids and other unapproved and misbranded drugs *while on duty*. In *U.S. v. Houser*, 1:20-CR-457 (N.D. Ga.), one of the individuals who manufactured and supplied illegal products containing anabolic steroids **to Blackstone Labs** received a probated sentence. The owners and operators of "Bodybuilding.com" got probation for selling illegal steroids online as dietary supplements in *U.S. v. Deluca*, 1:12-CR-090 (D. Idaho) and related cases. In *U.S. v. Seesholtz*, 3:20-CR-202 (M.D. Pa.), the government argued for a multi-year sentence because "this wasn't a matter of simply peddling anabolic steroids on the street. It was a matter [of] importing the raw materials from China, manufacturing them here and even selling some in a storefront" in "pretty extensive" quantities of up to 60,000 units. The district court gave Mr. Seesholtz probation, focusing on his lack of any other criminal history, the unlikelihood of his recidivism, and letters from his supporters.[9] The government

---

[9] The government may point to *U.S. v. USPLabs, LLC, et al.*, 3:15-CR-496 (N.D. Tex.). That case did not involve anabolic steroids, instead, the focus was on synthetic stimulants including dimethylamylamine ("DMAA"). USP Labs' synthetic stimulants were active but **unlabeled** ingredients in their weight-loss and workout products. Ingestion of those unlabeled ingredients caused a "liver injury outbreak" that sent dozens of USP Labs' consumers to hospitals and required several life-saving liver transplants. 3:15-CR-496, Doc. 95, Pg. 12. One of the involved USP Labs products – a workout booster called "Jack3d," containing DMAA – was linked to the death of two soldiers, causing the military to pull all products containing similar active ingredients from base shelves. *See* "A Workout Booster, and a Lawsuit," www.nytimes.com/2013/02/14/business/death-after-use-of-jack3d-shows-gap-in-regulation.html. The death of a British marathon runner, who used USPLabs' Jack3d, was ruled by the coroner to be caused by cardiac failure complicated by DMAA toxicity. *See* "Claire Sqiures inquest: DMAA was factor in marathon runner's death," www.bbc.com/news/uk-england-london-21262717. USP Labs made $400,000,000 selling these products for over five years – at least 100 times more in sales than is involved in this case (~$2 million, *see* PSI ¶ 75). Even with linked deaths and the other aggravating circumstances not present here, the President of USP Labs

16

wanted multiple years of imprisonment for the defendant in *U.S. v. Brooks*, 1:21-CR-034 (W.D. Va.), who specifically created his company to distribute anabolic steroids, hid the manufacture of steroids from the government, and sold those steroids for years as "dietary supplements," but the district court gave him probation, too. "Obvious remorse" and "charitable work" convinced the court in *U.S. v. Wood*, 1:16-CR-007 (W.D. Va.) to give the defendant there – who misbranded and distributed more than $1 million worth of anabolic steroids – probation instead of a multi-year guidelines sentence.

Sentencing Mr. Singerman to a lengthy term of imprisonment well beyond ***any*** sentence ever imposed for similar conduct does not work justice. His remorse, his charitable works, his commitment over the past years to regulatory compliance and safety, and all the demonstrated good that he does for his family, employees, and society at large should convince this Court that he, like many of those defendants in these cited cases, deserves the opportunity of a less draconian sentence.

### F.   Restitution

The need to provide restitution to any victims of the offense is a valid consideration for this Court in determining the magnitude and sort of the sentence to impose here. 18 U.S.C. § 3553(a)(7). As a component of his guilty plea, Mr. Singerman agreed to the entry of a forfeiture money judgment in the amount of $2.9 million. That amount, to which Mr. Singerman voluntarily agreed, is $600,000 more than was received by Blackstone itself from the unlawful distribution of its products ($2,287,000, PSI ¶ 75) and $1,000,000 more than Mr. Singerman himself received in deposits from Blackstone during the entire course of his involvement with that company. (PSI ¶ 116.) He has agreed to pay in full any restitution for consumer victims harmed by any involved product. (PSI ¶ 8.) Prior to sentencing, Mr. Singerman intends to remit the entirety of the forfeiture judgment amount and any restitution payment to the government.

---

received 24 months' imprisonment, the vice-president of a related manufacturing firm received 41 months, and the CEO of USP Labs received 60 months.

As far as the undersigned can tell, Mr. Singerman's forfeiture and restitution here represent the largest financial penalties even imposed on an individual defendant in a case of this nature. That he has complied with those payments voluntarily and expediently, without requiring the government to expend additional effort in identifying and obtaining assets to satisfy a judgment, is deserving of this Court's consideration.

## Conclusion

This Court's charge is to impose no greater sentence than necessary to comport with the statutory purposes of sentencing. Under all the circumstances of Mr. Singerman's case, a sentence of not more than 20 months' imprisonment amply suffices. Such a sentence would represent the longest term of imprisonment ever imposed for anyone peddling anabolic steroids under the guise of "dietary supplements." That term of imprisonment would be coupled with the largest financial penalties ever imposed on an individual for this kind of conduct. A sentence of that sort would recognize the severity of the charged crimes and punish and deter future violations, while also crediting Mr. Singerman's particular circumstances and history.

Mr. Singerman has shown the person he is and the values he holds since leaving Blackstone Labs in 2016. He has built a company laser-focused on consumer safety and regulatory compliance. He shows his generous character through his charitable work, through the way he treats everyone around him, and by the way he focuses on what is most important in his life – his family.

For all these reasons, we ask that the Court consider a sentence that suffices, but does not exceed, what is necessary here. Removing Mr. Singerman from society for any lengthy period of time "doesn't help anything, it only hurts his family and those that are tied to the positive businesses that he has built, providing jobs and a second family to so many." (Letter of E. Hart.)

Respectfully submitted, this 21st day of January, 2022.

**GRIFFIN DURHAM TANNER & CLARKSON LLC**

By: */s/ R. Brian Tanner*
James D. Durham (*admitted pro hac vice*)
Georgia Bar No. 235515
jdurham@griffindurham.com
R. Brian Tanner (*admitted pro hac vice*)
Georgia Bar No. 697615
btanner@griffindurham.com
7 East Congress Street, Suite 703
Savannah, GA 31401
P/F: 912-867-9140

**OLIVER MANER LLP**

*/s/ William J. Hunter*
William J. Hunter (*admitted pro hac vice*)
Georgia Bar No. 141288
bhunter@olivermaner.com
218 West State Street
P.O. Box 10186
Savannah, GA 31412
P: 912-236-3311
F: 912-236-8725

**MORSE & MORSE, LLC**

*/s/ Amy Morse*
Amy Morse, Esq.
Of Counsel to Richard G. Lubin, P.A.
FL Bar No.: 0388475
amy@morselegal.com
707 North Flagler Drive
West Palm Beach, FL 33401
P: 561-651-4145
F: 561-655-2182

**RICHARD G. LUBIN, P.A.**

*/s/ Richard G. Lubin*
Richard G. Lubin, Esq.

>Florida Bar No. 182249
>rich@lubinlaw.com
>707 North Flagler Drive
>West Palm Beach, FL 33401
>P: 561-655-2040
>F: 561-655-2182

## CERTIFICATE OF SERVICE

I hereby certify that on January 21, 2022, I electronically filed the foregoing document with the Clerk of Court, using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

>*/s/ Amy Morse*
>**Amy Morse, Esq.**