UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 19-80030-CR-DIMITROULEAS

UNITED STATES OF AMERICA

vs.

AARON SINGERMAN,

      **Defendant.**

                               /

**UNITED STATES' SENTENCING MEMO**

The United States, by and through the undersigned counsel, respectfully submits this sentencing memorandum for the Court's consideration in advance of the January 27, 2022 sentencing of defendant Aaron Singerman (Singerman).

Singerman was a key leader of the criminal conspiracies executed by Blackstone Labs, LLC (Blackstone Labs), where the defendants earned millions through fraud while callously disregarding health risks to tens of thousands of consumers. Singerman's motivation for the criminal activity was clear. As Singerman wrote in an email of August 31, 2012, "I just imagine them [steroid bottles] all as $50 bills." For Singerman, each bottle falsely labeled as dietary supplements would add to his growing wealth – with little thought to the consequences to others.

**I.  Factual Background**

The government refers the Court to Singerman's factual proffer, ECF No. 537, and the presentence investigation report, ECF No. 540, for a detailed summary of the facts.

For nearly four years, the defendant organized and led a sophisticated steroid manufacturing and distribution scheme, utilizing outwardly legitimate companies to sell millions of doses of steroids to unwitting consumers under the guise of "safe" and "legal" dietary

supplements. The defendant's fraudulent scheme distributed illegal steroids, synthetic stimulants, mind-altering chemicals, and other muscle-building products to all 50 states and to those outside the United States. Blackstone Labs relied on dozens of supplement retailers, many unwitting, a team of wholesale employees, including co-defendant James Boccuzzi (Boccuzzi), and an email and web marketing campaign to sell products directly to consumers.

As detailed in the factual proffer, Singerman, co-defendant Phillip Braun (Braun), and co-defendant Robert DiMaggio (DiMaggio) started Blackstone Labs for the sole purposes of selling unsafe and illegal products. Over time, Singerman and his co-defendants avoided scrutiny by deceit and by shifting their sales to new unapproved or unsafe products to sustain their business and income. The defendants schemed to make money the "easy way," combining lies with sophisticated online advertising and a total disregard for their customer's health. At the height of Blackstone conspiracy, Singerman collected $50,000-70,000 per month, which he removed from the Blackstone Labs bank account without regard to the business's debts or commitments. Singerman and Braun also used the corporate accounts to purchase extravagant luxury cars, and they maintained a luxurious lifestyle by billing their travel, food, and clothing to Blackstone Labs as business expenses.

Records from the investigation show that from 2014 to 2016, the defendants sold more than $2.9 million in steroid products.[1] These products were routinely sold for $50-60 per bottle to consumers or $25 per bottle wholesale, but even a conservative estimate of $45/bottle means Blackstone Labs sold more than 70,000 bottles of steroids. As each bottle contained 60 capsules, the defendants distributed nearly four million doses of steroids.

---

[1] These calculations do not include sales from 2012 and 2013 as reliable records from Blackstone Labs were unavailable.

More alarmingly, they sold these steroids to unwitting victims who did not know they were steroids and would not have taken them if they had known. One such victim, C.H., testified at co-defendant Boccuzzi's trial, and three other victims will submit statements to the Court explaining the impact on their health, lives and finances.

Singerman knew that there were risks to people taking his steroid products. For example, in an April 2013 email, Singerman discussed with DiMaggio the steroid "methyl-1-etiocholenolol-epietocholanolone,"[2] the ingredient subsequently used by Blackstone in the product "Alpha-1 Max" purchased by C.H. and other victims. DiMaggio advised that he chose a different ingredient because it had fewer side effects. Singerman acknowledged the side effects, calling methyl-1-etiocholenolol "harsh as hell." In November 2014, Singerman received a link to a scientific article reporting on medical injuries associated with Blackstone Labs product Super DMZ RX 2.0. EX. A (linking to Agbenyefia, Priscilla, "Cholestatic Jaundice With the Use of Methylstenbolone and Dymethazine, Designer Steroids Found in Super DMZ Rx 2.0 'Nutritional Supplement': A Case Report," J. Investig. Med. High Impact Case Rep. (Apr. 22, 2014)).[3] Nevertheless, and with full understanding of the potential harm this drug could cause to customers, Singerman distributed these products throughout the United States. Later, when victims contacted Blackstone Labs directly, Singerman and Braun reviewed their complaints and disregarded their pleas for assistance. Nor did they report the harm these drugs caused to customers to the FDA.

## II.     Guidelines Calculation

The Probation Office correctly calculated Singerman's Sentencing Guidelines for his offenses and his combined adjusted offense level is 28, which yields an advisory guidelines range of 78 – 97 months of incarceration. See ECF No. 633, PSR. There are no factual disputes

---

[2] Correctly referenced, and as it appears in the indictment, this substance is simply "methyl-1-etiocholenolol."
[3] The victim referenced in the case study, J.V., submitted a victim statement to the Court.

regarding the guidelines, which are consistent with those the parties jointly recommended the Court adopt in the plea agreement and with the facts Singerman admitted in his signed factual proffer, which the Court accepted after reviewing it with him at his change of plea hearing. Notably, the defendant would face similar guidelines for either of his two counts of conviction, whether under the Section 2B1.1 fraud guideline or the 2D1.1 controlled substances guideline.

The defendant incorrectly calculates his guidelines as including a two-level reduction for acceptance of responsibility, which the government and Probation do not recommend. In the plea agreement, the government agreed to recommend a two-level reduction for acceptance of responsibility if the defendant complied with certain requirements. The government did not agree to a third point for acceptance of responsibility as the defendant pleaded guilty approximately one week before the long-delayed trial, and after rejecting earlier plea offers. Here, where Singerman has admitted to violating state law by operating a boat under the influence of alcohol and resulting in having his driver's license revoked, and then crashed a car while driving on a revoked license, a two-level reduction for acceptance of responsibility is not appropriate.

    A. <u>Count 4: Conspiracy to Distribute Controlled Substances</u>

The parties agreed on the following sentencing guidelines: That the base offense level is 20, pursuant to Section 2D1.1(a)(5) and 2D1.1.(c)(10). The base offense will increase by 2, pursuant to Section 2D1.1(b)(7), because controlled substances were distributed through mass-marketing by means of an interactive computer service. The base offense will increase by 2, pursuant to Section 2D1.1(b)(12), because the defendant maintained a building or premises for the purpose of distributing controlled substances. The defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, and the offense

level will increase by 4 levels pursuant to Section 3B1.1(a). Therefore, the total adjusted offense level would be 28.

### B. Count 3: Introduction of an Unapproved New Drug into Interstate Commerce

The parties agreed on the following sentencing guidelines: That the base offense level is 6, pursuant to Section 2N2.1(c)(1) and 2B1.1(a). The loss is between $1,500,000 and $3,500,000, pursuant to Section 2B1.1(b)(1)(I) and 1B1.3, increasing the offense level by 16. The offense was committed through mass marketing and the offense level will increase by 2, pursuant to Section 2B1.1(b)(2)(A). The defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, and the offense level will increase by 4 levels. Therefore, the total adjusted offense level would be 28. The offenses are grouped together for sentencing purposes, pursuant to Sections 3D1.2(d) and 3D1.3(b).

### C. Advisory Guideline Range

With a combined offense level of 28, under criminal history category I, defendant is in Zone C, with an advisory range of 78-97 months' imprisonment.

### D. Fine, Forfeiture

Under Guidelines § 5E1.2(c)(3), the defendant's fine range is $25,000 to $250,000. Pursuant to 18 U.S.C. 3571(d), the Court may impose a fine of up to $250,000, or up to twice the gross loss. The defendant appears to have the ability to pay a significant fine. Given his financial ability and the seriousness of the crime, the government recommends a $250,000 fine.

Pursuant to his plea agreement, defendant agreed to a $2,900,000 forfeiture money judgment.

### III. Sentencing Factors and Argument

Singerman's relevant conduct merits a substantial sentence of incarceration, within the Sentencing Guidelines range. Singerman was one of the co-founders and leaders of Blackstone and a central figure in the extensive fraud and drug distribution scheme.

#### A. <u>Respect for the Law</u>

The Court should impose a substantial sentence to promote respect for the law. Although Singerman professes to now run a successful and compliant dietary supplement company, his years-long pattern of deception and willingness to profit at the expense of consumer safety demonstrated a blatant, persistent disregard for the rule of law. Nor does it appear that the defendant is fully remorseful for the crimes. In December 2021, after pleading guilty to the charges in this case, the defendant gave a speech at the holiday party for his current business. Singerman stated, as recorded on video:

> And in this year it would be easy to say I wish this didn't happen or I wish that didn't happen or I wish we could have done something different or maybe I could go back and rewind if I could rewind I wouldn't have done that thing. But the truth is you can't do that and life doesn't work that way. If you were to rewind back to that day with that other company [Blackstone Labs] who knows where we'd be, all of you guys, and me, we certainly wouldn't be standing in Mar-a-Lago talking about this. So life works out the way it's supposed to work out, right
> . . .
> **The truth is I wouldn't change anything. I wouldn't do anything differently**."

Available at https://bocanewsnow.com/2021/12/25/felon-aaron-singerman-redcon1-founder-makes-stunning-comment-at-mar-a-lago-party/ (emphasis added).

This unguarded statement by the defendant suggests an ethos in which the ends justify the means, including the criminal conduct that paved the way for his present economic success.

The defendant's sentencing memorandum, ECF No. 636, discusses the defendant's current business, an even larger dietary supplement company, as a reason why he is unlikely to reoffend

6

and incarceration would be unnecessary. At least in part, the defendant's argument boils down to a claim he should not be punished because he is now extremely successful in conducting a business that was literally built upon the lessons, reputation, and connections gained from years of criminal activity. The government rejects this point of view. Although the defendant may currently enjoy business success, this success does not wash away the stains of his lengthy and significant criminal conduct. Thus, the government respectfully urges the Court to impose a significant prison sentence within the Guidelines range as a necessary way to promote respect for the law, and to deter future criminal conduct by this defendant and others in the dietary supplements industry.

B. <u>Need for Sentence to Reflect Seriousness</u>

The offenses here are serious, as shown in the victim statements, the brazen crimes, long-term efforts to hide activities from law enforcement, especially the FDA, and the vast quantities of unlawful products. In particular, the volume of drugs distributed vastly exceeds the amounts contemplated by the Sentencing Guidelines. The Guidelines Drug Quantity Table sets forth the volume of steroids doses or capsules, setting the offenses levels at 1,000, 2,500, 5,000, 20,000, 40,000, or 60,000 units or capsules.[4] Singerman and his co-defendants sold millions of pills in 60 dose bottles.

The defendant engaged in this drug manufacturing and distribution scheme without any consideration for the adverse personal or societal effects of steroid use and did so for his own financial gain. This puts him in the same category as any other drug dealer — regardless of the type of substance he distributed.

---

[4] One "unit" means one pill, capsule, or tablet. U.S.S.G. § 2D1.1 Note F.

C. <u>Sentencings for Similar Conduct</u>

A lengthy sentence of incarceration is appropriate for the defendant. The government is unaware of cases with similar conduct – a multi-year scheme selling millions of doses of steroids and numerous illegal products all under the guise of a legitimate business operating online with a conspiracy to impede FDA's regulation of dietary supplements. In any event, contrary to defendant's narrow focus on other cases specifically involving the mislabeling of steroids as dietary supplements, defendants who distributed large quantities of anabolic steroids are regularly incarcerated for lengthy terms. For example, in <u>United States v. Kestel</u>, No. 1:19-cr-244 (E.D.V.A.), the defendant was sentenced to 60 months' imprisonment for distributing anabolic steroids and money laundering. Kestel engaged in this conduct for three years, and court documents state that he distributed tens of thousands of units of anabolic steroids, with proceeds of at least $370,000. In <u>United States v. Ryan Root</u>, No. 3:15-CR-261 (N.D.N.Y.), the defendant was sentenced to 78 months in prison for steroid distribution and international money laundering convictions. Root purchased distribution-sized amounts of anabolic steroids from China for several years, then arranged for them to be shipped to him and nine co-conspirators to be resold around the country. In <u>United States v. Lambert</u>, No. 2:20-cr-001 (E.D.V.A), the defendant was sentenced to 108 months' imprisonment for conspiracy to distribute and possession with intent to distribute anabolic steroids and for being a felon in possession of a firearm. The government estimated that the defendant distributed at least tens of thousands of steroid units and earned over a million dollars in profits over two and a half years.

The defendant's argument that a Guidelines sentence in this case would be unprecedented and overly severe ignores cases imposing significant prison sentences for anabolic steroid distribution conspiracies that were smaller and less profitable than the defendant's.

D. Restitution

The Court should order restitution and it should be joint and several with Singerman's co-defendants. Restitution is still being calculated in this matter.

E. Deterrence of Criminal Conduct

The dietary supplements industry is enormous. Three years ago, the then-commissioner of the FDA estimated that the industry earns approximately about $40 billion in revenue per year, with at least 50,000 different products available to consumers. See Statement from FDA Commissioner Scott Gottlieb, M.D., on the agency's new efforts to strengthen regulation of dietary supplements by modernizing and reforming FDA's oversight, Feb. 11, 2019, https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-agencys-new-efforts-strengthen-regulation-dietary (last visited Jan. 18, 2022). To deter criminal conduct, it is necessary that there be appropriate punishment for those who risk the public health by intentionally violating the law and FDA's regulation of the dietary supplement industry.

F. Fine and Costs of Incarceration

The defendant should be ordered to pay a fine at the maximum of the guideline fine range ($250,000), the mandatory special assessment, and the costs of incarceration (as set forth in the PSR). Where, as here, a defendant has ample net worth, the taxpayers should not be responsible for the costs of his incarceration.

**IV. Conclusion**

Singerman founded and led a sophisticated, multi-year conspiracy to defraud and sell dangerous products to thousands of consumers throughout the United States. He knew his acts were wrong and could lead to criminal penalties, but continued with impunity. He is a lead

9

defendant, and his role, history, and characteristics support him receiving a substantial sentence. In light of the factors set forth in 18 U.S.C. § 3553(a), a guideline range sentence is appropriate to reflect the seriousness of the offense, to provide deterrence and protect members of the public, and to promote respect for the law.

Dated: January 26, 2022

                Respectfully submitted,

                JUAN ANTONIO GONZALEZ
                UNITED STATES ATTORNEY

                GUSTAV W. EYLER
                DIRECTOR
                U.S. DEPARTMENT OF JUSTICE
                CONSUMER PROTECTION BRANCH

                */s/ Alistair Reader*
                ALISTAIR F. A. READER
                Court ID A5502377
                Trial Attorney
                STEPHEN J. GRIPKEY
                Court ID A5502620
                Trial Attorney
                JOHN W. BURKE
                Court ID A5501294
                Assistant Director
                U.S. Department of Justice
                Consumer Protection Branch
                P.O. Box 386
                Washington, D.C. 20044-0386
                Alistair.F.Reader@usdoj.gov
                (202) 353-9930
                Stephen.Gripkey@usdoj.gov
                (202) 307-0048
                Josh.Burke@usdoj.gov
                (202) 353-2001

**CERTIFICATE OF SERVICE**

I hereby certify that on January 26, 2022, I electronically filed the foregoing document with the Clerk of the Court, suing the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

                                                                                                                                */s/ Alistair Reader*
                                                                                                                            Alistair Reader
                                                                                                                            U.S. Department of Justice